Timothy **WAGNER** and John **Payment, Plaintiffs,**

v.

**COUNTY OF CATTARAUGUS, Jerry E. Burrell, Sheriff of the County of Cattaraugus, Lieutenant Investigator Ernie Travis, Deputy Sheriff Investigator Dennis John, and Deputy Sheriff Investigator Dale Finch, Defendants.**

No. 93–CV–6177L.

United States District Court, W.D. New York.

Oct. 19, 1994.

Lawrence J. Andolina, Harris, Beach & Wilcox, Rochester, NY, for plaintiffs.

Peter F. Brady, Damon & Morey, Buffalo, NY, for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

There is a familiar adage that the truth is often stranger than fiction. This case illustrates the accuracy of that maxim.

The events that occurred on April 23, 1992 and which ultimately resulted in the seizure and arrest of plaintiffs Timothy Wagner ("Wagner") and John Payment ("Payment") are indeed strange. The arrest of Wagner and Payment by defendants is the basis for this lawsuit. Plaintiffs contend that they were arrested without probable cause and that their constitutional rights were violated. Plaintiffs filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging constitutional violations under the Fourth and Four-

teenth Amendments as well as pendent state law claims for false arrest and false imprisonment against the County of Cattaraugus and several officers in the Cattaraugus County Sheriff's Department.

Before the Court are the parties' cross-motions for summary judgment. Defendants moved for summary judgment and sought dismissal of the complaint as to all defendants. Defendants concede that the warrantless seizure of plaintiffs was an arrest, but they contend that there was probable cause for the arrest and, in the alternative, that defendants' actions are protected by qualified immunity.

Plaintiffs cross-moved for summary judgment on liability. They contend that probable cause was lacking for the arrest and that the officers' actions were so arbitrary and unreasonable that they are not shielded by qualified immunity.

### FACTS

The essential facts necessary to decide the pending motions are not in dispute. Sometime during the late morning or early afternoon on April 23, 1992, defendant Lieutenant Ernest R. Travis issued an all points bulletin ("APB") to "pick up and hold" two unidentified suspects (Wagner and Payment) who were driving a 1983 van with New York license ILC 596. Travis admitted at his deposition that the intent of the APB was to have the suspects brought back for "questioning." (Plaintiff's Notice of Motion for Summary Judgment, filed September 2, 1994, Ex. G at 37.) The APB contained the warning that the suspects were armed and dangerous.

Sometime after 12:30 p.m., plaintiffs were arrested pursuant to the APB by New York State troopers in the Town of Forestville, Chautauqua County, approximately 30 miles from Randolph, New York in Cattaraugus County where the incidents which caused the APB to issue occurred.

The APB had been issued by Lieutenant Travis based on information he and fellow officers had received from a citizen who reported an unusual sighting. At approximately 11:05 a.m. on April 23, deputies in the

Cattaraugus County Sheriff's Department received a telephone call from a bank employee, Karen Lecceadone ("Lecceadone"), advising that a man wearing a rabbit's mask had looked into the windows of the Cattaraugus County Bank where she was employed.

Lieutenant Travis dispatched two deputies, defendants Dale I. Finch ("Finch") and Dennis B. John ("John") to the scene, and at about 11:19 a.m. the deputies reported that they had arrived in Randolph.

The deputies interviewed Lecceadone and she advised them that a customer had come into the bank with her granddaughter and told Lecceadone that they had just seen the "Easter Bunny" outside the bank. According to her statement, (Ex. B to Defendants' Motion for Summary Judgment, filed August 18, 1994), Lecceadone stated that at the same time the customer reported seeing the Easter Bunny, an employee whom she knew from Norstar Bank, Claudia Bemus, came into the Cattaraugus Bank and reported that she had seen a man get out of a blue van wearing a rabbit's mask. She reported that the man "looked in" bank windows, returned to the van and, with another man, went to the Gates Cafe. Apparently, someone then called the Gates Cafe and determined that no one knew the strangers. Lecceadone told the officers that she left the bank and observed the two men leave the cafe and heard them say something about the local police station. She observed them walk up to the unmanned village police station, and she observed them "checking out" Norstar Bank. When asked why their actions were suspicious Lecceadone replied that the men "just kept looking around, checking things out." *Id.*

By the time the officers arrived in Randolph, the men had left town. There is no indication that the officers interviewed any of the customers at Gates Cafe or that they interviewed the bank customer who had, with her daughter, first spotted the "Easter Bunny."

The mask in question, which was later recovered in the van subsequent to plaintiffs' arrest, was a full-size, 1½– to 2–foot high, paper-mache mask which covers the entire head. It has pipe-cleaner whiskers, large eyelets and enormous pink ears (Ex. C [photograph], to Affidavit of Lawrence J. Andolina, Esq., in support of Cross–Motion for Summary Judgment filed September 2, 1994). By any account, this is a very large, noticeable mask.

The information obtained by deputies Finch and John was passed on to Lieutenant Travis who checked with the Department of Motor Vehicles to determine the owner of the van. Travis learned that Wagner owned the van and he then contacted the FBI office in Jamestown, New York to see if Wagner had a criminal record. The FBI informed Travis that Wagner had a criminal record and were awaiting further information. Based on this information, Travis issued the APB. At his deposition, Lieutenant Travis stated that he ordered the arrest because he believed the men were "bank robbers." When questioned further, he stated that he believed he had probable cause to arrest the men for "attempted bank robbery," but at another point during the deposition he conceded that he did not have probable cause to issue the APB; rather, he issued the APB "to ascertain if a crime had been committed." (Plaintiff's Notice of Motion for Summary Judgment, Ex. G at 36, 38.)

Sometime after issuing the APB, apparently before plaintiffs had been arrested, Travis discovered that the conviction was for "some type of perjury" under Title 26 of the United States Code. Not knowing what Title 26 was, and not being able to locate the District Attorney, Travis checked some law books at the library and determined that Title 26 was the Internal Revenue Code. (Ex. C to Defendant's Notice of Motion for Summary Judgment; Ex. G to Plaintiff's Notice of Motion for Summary Judgment).

Based on the APB, plaintiffs were arrested at gunpoint in Chautauqua County by the New York State troopers, handcuffed and transported in State Police vehicles back to Cattaraugus County. The arresting officers, the State Police troopers, knew nothing about the incident which caused the arrest and were merely complying with the APB. None of the State troopers are named as defendants.

After plaintiffs had been arrested and returned to Cattaraugus County, they were interviewed by defendants and the District Attorney, and it was determined that plaintiffs' activities were not criminal but were entirely innocent.

It appears that Wagner, a grade-school vice-principal in Rochester, New York, and his friend, Payment, were travelling on holiday throughout Western New York during the Easter school recess. Wagner had been convicted of a felony relating to income tax evasion charges, and the terms of his probation limited his travel to the Western District of New York, that is, the seventeen counties in the western part of the state.

As Wagner and Payment were eating breakfast at the Gates Cafe on that fateful morning, they observed a small girl in the restaurant dressed in her Easter finery. The men decided it would be a treat for the girl if one of them went to the van, put on the "Easter Bunny" mask and walked to the window of the restaurant to surprise the girl. Payment then left the restaurant, went to the van and put on the rabbit's head. He walked to the front of the cafe, waved in the window and once the child saw him, he deposited the mask back in the van and returned to finish his breakfast. Neither Wagner nor Payment recalled "looking in" any bank windows.

During their trip, as plaintiffs passed into each county, they would stop the van, put on the rabbit's mask and take a picture next to the road sign which indicated entry into that particular county. They also had a seven foot stuffed dog in the van which apparently also posed for some of these road-side pictures.

To prove that their travel complied with Wagner's probationary restrictions, plaintiffs asked law enforcement officials in each county to memorialize their visit by signing and dating their visit. Plaintiffs did recall attempting to find a police officer in Randolph that morning for that purpose. In fact, after this entire matter had been concluded, they asked the District Attorney of Cattaraugus County, who had been summoned by that time, to autograph their map.

After both plaintiffs had been interviewed separately and told the same story, they were released and no charges were filed. Plaintiffs were in custody for approximately two and a half hours before they were released. By the time plaintiffs were released, "everyone was kind of laughing and joking" about the day's activities. (Defendants' Motion for Summary Judgment, Ex. I at 62).

As is evident from this lawsuit, it is no longer a laughing matter.

### DISCUSSION

**Summary Judgment—Standards**

█ A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). All ambiguities and inferences must be resolved in favor of the non-moving party and all doubts as to the existence of a general material issue for trial should be resolved against the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

If, when "[v]iewing the evidence produced in the light most favorable to the non-movant ... a rational trier could not find for the non-movant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir. 1991); *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

No genuine issue of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party ..." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

█ To defeat summary judgment, the non-moving party must go beyond the pleadings and designate "specific facts showing that there is genuine issue for trial." Fed. R.Civ.P. 56(c). An argument that there are material factual issues which preclude a grant of summary judgment must be supported by concrete particulars. *Dressler v.*

*M.V. Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964). Mere denials or general allegations without evidentiary support will not defeat a summary judgment motion. *Engl v. Aetna Life Ins. Co.*, 139 F.2d 469, 473 (2d Cir.1943).

A non-moving party may not rely on mere conclusory allegations but must set forth "concrete particulars" to defeat summary judgment. *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983).

■ Finally, the fact that both parties have moved for summary judgment does not mean that the Court must grant summary judgment for one of the parties, and it does not change the burden on the moving party to show the absence of a genuine issue of fact. *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). Each party's motion must be evaluated on its own merits and all reasonable inferences must be drawn against the party whose motion is under consideration. *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir.1981).

If no rational jury could find in favor of the non-moving party, because the evidence to support that party's case is so slight, then summary judgment is proper. *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994), citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988).

### *The Arrest Of Plaintiffs*

■ I find as a matter of law that the seizure of plaintiffs constituted a warrantless arrest which was not based on probable cause. I find that no reasonable juror could conclude otherwise. Plaintiffs are entitled to summary judgment on this issue.

In some cases involving questionable police seizures, there may be a legitimate issue as to whether or not the police contact with the citizen constituted an arrest, which must be supported by probable cause, or whether it constituted but a brief detention, such as a *Terry* stop [1], which need not be supported by probable cause. *See, e.g., Oliveira*, 23 F.3d at 646–47.

In this case, however, defendants do not attempt to justify their conduct on the grounds that this was not an arrest. Defendants' have conceded that, based on the admitted facts, both defendants were arrested. Defendants' steadfastly maintain, however, that there was probable cause for the arrests. I disagree.

■ The Fourth Amendment protects citizens against "unreasonable searches and seizures." The Fourth Amendment requires the police to have probable cause before they may effect a warrantless arrest. Probable cause, of course, is not a rigid formula but an elastic one that depends on the facts and circumstances of each case.

Probable cause has been defined as the "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975) (citations omitted).

The police may only make arrests based on probable cause. Arrests based on mere suspicion, like arrests executed only to investigate a person, are "foreign to our system." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972); *Mallory v. United States*, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479 (1957). "'Arrest on mere suspicion collides violently with the basic human right of liberty.'" *Henry v. United States*, 361 U.S. 98, 101, 80 S.Ct. 168, 170–71, 4 L.Ed.2d 134 (1959) (citation omitted).

■ Conjecture, surmise or suspicion are not enough to justify an arrest. Courts have consistently struck down arrests where the Court determined that the citizen was detained, seized and arrested on the guess, suspicion or hunch of a police officer. The basic purpose of the Fourth Amendment is to protect the citizens' right to be free from unreasonable restraints by Government officials. It stands as testament to the value we place on liberty. "It is better, so the Fourth Amendment teaches, that the guilty sometimes go free than that citizens be subject to

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20   L.Ed.2d 889 (1968).

easy arrest." *Henry*, 361 U.S. at 104, 80 S.Ct. at 172.

In this case, I do not believe any reasonable juror could conclude that there was probable cause for an arrest. I do not believe there are any disputed facts at issue here and the issue involves a question of law.

It is clear that no bank robbery had occurred, and it is difficult to imagine how a reasonable police officer could have believed that an attempted robbery had occurred. *See Oliveira*, 23 F.3d at 648. The only evidence that the police had was hearsay, or double hearsay, that a person wearing an outlandish mask had "looked" into a bank window. It is true that the men were strangers to town and that this activity was not "normal" but it is difficult to see how merely looking through the window of a bank or other commercial establishment could constitute probable cause to arrest. The observations which triggered the arrests were not made by trained police officers, but by citizens who simply reported what they believed to be unusual. Although citizen complaints can certainly be utilized by the police in determining whether or not probable cause exists, the vague, general comments of Ms. Lecceadone hardly justify the drastic action taken by the police here.

It is hard to imagine why a true potential bank robber would don such a bizarre, attention-grabbing mask if he were in fact about to commit a robbery. Generally, stealth is preferred when engaging in such activity. Slipping on the rabbit's head would guarantee widespread attention which is precisely what a scheming robber would want to avoid. There is no evidence that the men fled, possessed weapons, or took any other action which would be consistent with attempted bank robbery.

The police investigation was woefully inadequate. There is no evidence that the police attempted to interview any of the patrons at the Gates Cafe or to interview the bank customer and little girl who first reported seeing the "Easter Bunny."

The fact that Wagner had a criminal record for perjury does not justify the arrest for bank robbery. It may have heightened Travis' suspicion, but it should not have been a significant factor in the decision to arrest.

At their depositions, Lieutenant Travis and Deputies Finch and John had great difficulty elucidating the basis for the arrest. Travis first stated that he had probable cause for "attempted bank robbery." (Plaintiffs' Motion for Summary Judgment, Ex. G at 36). Later in the deposition, Travis conceded that he did not have probable cause for bank robbery, but that he issued the APB "to ascertain if a crime had been committed." (*Id.* at 38). Travis also admitted, however, that the true purpose of the APB was to bring plaintiffs back to Cattaraugus County for questioning, against their will. He confirmed that the suspects were not free to go and if they had refused to cooperate, he would have charged them with obstruction of justice. (*Id.* at 37).

Deputies Finch and John believed that the activity was suspicious, but John conceded that he did not believe probable cause existed for the arrest. (*Id.*, Ex. E at 20).

Admittedly, the activity was bizarre enough that, if the plaintiffs had been in Randolph, it may have been permissible for an officer to briefly stop the men and inquire about their conduct. At the time they were arrested, however, plaintiffs were out of town many miles from the bank, and obviously neither man posed a danger to the bank at that time. There was simply no justification at that time to arrest plaintiffs at gunpoint and transport them back to Cattaraugus County in handcuffs.

### QUALIFIED IMMUNITY

▆▆ I also find that defendant Travis is not protected by qualified immunity. Although this issue is slightly closer than the arrest issue, in light of the facts developed here, I believe the officers' conduct to be so unreasonable that no reasonable police officer should have believed that he was acting in accordance with established law and procedure concerning warrantless arrests. *See Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994); *see also Newkirk v. Sheers*, 834 F.Supp. 772, 784 (E.D.Pa.1993). Plaintiffs are thus entitled to summary judgment as to liability against defendant Travis.

Defendants contend that even if the Court determines that probable cause was lacking, plaintiffs' § 1983 action should be barred by the doctrine of qualified immunity.

The doctrine of qualified immunity shields public officials performing discretionary functions from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396] (1982), or "insofar as it was objectively reasonable for them to believe that their acts did not violate those rights," *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* [— U.S. —] 112 S.Ct. 3032 [120 L.Ed.2d 902] (1992).

*Bradway v. Gonzales,* 26 F.3d 313, 317–18 (2d Cir.1994).

■ A decision on this matter is ripe for adjudication now on summary judgment, especially since there has been complete discovery in the case. It is well-established that issues involving the defense of qualified immunity should ordinarily be decided "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). The directive from the Supreme Court and from the Second Circuit is that this defense "often can and should be decided on a motion for summary judgment." *Castro v. United States,* 34 F.3d 106, 112 (2d Cir.1994).

The Supreme Court has advised that questions of immunity should be resolved "at the earliest possible stage of the litigation." *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987). In accordance with this exhortation, the Second Circuit has said:

The better rule, we believe, is for the court to decide the issue of qualified immunity as a matter of law, preferably on a pretrial motion for summary judgment when possible. . . . The ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.

*Warren v. Dwyer,* 906 F.2d 70 (2d Cir.1990).

■ It is clear that questions of immunity are ordinarily decided by the Court not the jury. *See Oliveira,* 23 F.3d at 649 (citing *Hunter v. Bryant,* 502 U.S. at 228–29, 112 S.Ct. at 537). This is true however only where the "facts" concerning the defense are undisputed. *See, e.g., Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993). But, as with all questions before a jury, if reasonable jurors could reach only one conclusion, then the issue is appropriate for decision by the Court as a matter of law. *Oliveira,* 23 F.3d at 649.

■ The constitutional right not to be arrested in the absence of probable cause is clearly established, *Soares v. State of Connecticut,* 8 F.3d 917, 920 (2d Cir.1993) (citation omitted), and known to all law enforcement officers. *See also Golino,* 950 F.2d at 870 ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right.")

Therefore, the first part of the qualified immunity consideration, that is, whether the police conduct here violated clearly established constitutional rights is not an issue in this case. The only possible grounds to support the qualified immunity defense is whether it was objectively reasonable for Lieutenant Travis, the defendant who caused the arrest, to believe that his action did not violate the constitutional rights of plaintiffs.

Cases do recognize a distinction between the standard for determining probable cause and the standard, in a false arrest case, for determining whether the officers are shielded by qualified immunity. *See Anderson,* 483 U.S. at 643, 107 S.Ct. at 3040. There is a distinction, but it is a subtle one. It is clear that any inquiry under the Fourth Amendment is based on "objective circumstances rather than an officer's subjective motivation." *Bradway,* 26 F.3d at 319 (citation omitted). I have determined that when viewed objectively, defendants lacked probable cause to arrest plaintiffs.

The question concerning qualified immunity also deals with reasonableness. It must be determined whether it was objectively

reasonable for the officers to believe that their acts did not violate constitutional rights, even if they were mistaken in that belief. "Officials are 'entitled to qualified immunity [when] their decision was *reasonable,* even if mistaken.'" *Castro,* 34 F.3d at 112, (citing *Hunter,* 502 U.S. at 229, 112 S.Ct. at 537.

The Second Circuit has recognized the "seeming circularity" involved in determining whether it was objectively unreasonable for officers to believe that their conduct was lawful, after the Court has found as a matter of law that the officers' conduct *was* unreasonable because there was no probable cause, i.e. that a reasonably prudent police officer would not have believed that plaintiff had committed a crime. *See Oliveira,* 23 F.3d at 648–49.

Although the distinction is subtle, the Second Circuit has discussed it and framed the proper inquiry:

In effect, the jury was asked to consider the same question, the "reasonableness" of [the officer's] arrest of [the suspect], from two perspectives: from the actual circumstances which it found as a matter of fact; and from any reasonable point of view, including even a factual misperception, the officer may reasonably have harbored at the time the events took place.

Within this framework, the question of immunity remains, as it should, distinct from the question of probable cause. *Mitchell v. Forsyth,* 472 U.S. [511] at 528 [105 S.Ct. 2806 at 2816, 86 L.Ed.2d 411] (1985).

*Warren,* 906 F.2d at 75.

In my view, there are no circumstances, and no jury could find, that it was objectively reasonable for Lieutenant Travis to believe that the arrest in this case did not violate clearly established rights.

From an objective standpoint, it is impossible to view the actions of the officers here as reasonable in light of clearly established law that citizens may not be arrested without probable cause.

What happened here was that two citizens were stopped, arrested at gunpoint, placed in handcuffs and transported many miles into another county. They were detained for almost three hours. All this occurred because they did something unusual and unexpected but involved conduct falling far short of conduct necessary to establish probable cause to arrest.

This was not a case where the officers knew that a crime had been committed and were seeking the perpetrators. In this case there was no evidence that a bank robbery had taken place. The men who performed the acts had left town. The arrest was precipitated based not on what trained police officers saw but on what a citizen observed. Citizen complaints, of course, can often form the basis for probable cause, but there must be much more than what occurred here. Essentially, the citizens saw a mask-wearing individual looking into windows. There is no indication that this "look" was anything more than momentary. If such conduct constitutes probable cause, then virtually every citizen who looks into a bank window could be subject to detention and arrest.

The officers' failure to take certain action demonstrates the unreasonableness of their conduct. As mentioned above, it does not appear that the police properly questioned those in the Gates Cafe or others to determine the true nature of plaintiffs' conduct. Such unusual conduct required further investigation before any arrest. It is also remarkable under these circumstances that the officers sought no legal advice. Furthermore, there was no justification whatsoever to describe the men in the APB as "armed and dangerous." There was no objective evidence to support that description.

Although the officers had not seen the mask when the APB was issued, had they questioned those who saw it, the nature of the mask would have belied an inference that criminal activity was afoot. As discussed above, it is difficult to imagine that a prospective bank robber would "case" the target bank wearing such a bizarre outfit. It is difficult to imagine apparel that would attract more attention.

Qualified immunity is meant to protect a police officer who reasonably believed that he was not violating constitutional rights. Not every error in judgment should result in liability. In this case, the police

response was so unreasonable that the offending officer should not be absolved for his conduct. Defendants' qualified immunity defense is, therefore, rejected.

### Liability As To Defendants Finch and John

■ The evidence is clear that although Deputies Finch and John investigated the incident, it was Lieutenant Travis who issued the APB that effected plaintiffs' arrest. Finch and John investigated the incident and passed on information but it was their superior, Travis, who decided to arrest plaintiffs.

Plaintiffs have not demonstrated what action Finch and John took that violated their rights. Regardless of the subjective belief of Finch and John as to whether there was probable cause for an arrest, their acts did not cause plaintiffs to suffer any violation of constitutional rights.

Plaintiffs have failed to establish causation as to Finch and John. To establish the requisite causation under § 1983, plaintiffs must show that the defendant participated in or was the "moving force" behind the constitutional deprivation. *Jeffries v. Harleston,* 21 F.3d 1238, 1247 (2d Cir.1994). Plaintiffs have failed to demonstrate such causation as to Finch and John and therefore defendants' motion for summary judgment as to them is granted.

### Municipal Liability

■ Plaintiffs have also named Cattaraugus County and the Sheriff of Cattaraugus County, Jerry Burrell as defendants. The allegation is that plaintiffs were arrested as the result of a custom or policy of the County. Although plaintiffs have established that they were arrested by Travis in violation of their rights, they have failed to adduce sufficient evidence that this arrest was undertaken or caused by any custom or policy of Cattaraugus County.

In *Monell v. Department of Social Services,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978), the Court held that a § 1983 lawsuit against a municipality must allege the existence of a custom or policy which is of such long standing as to have the force and effect of law. That Court further defined "custom" as the "persistent and widespread discriminatory practice of state officials." *Id.* at 691, 98 S.Ct. at 2036.

■ Moreover, municipal liability is only appropriate where an actor with "final policymaking authority" has been involved in the challenged conduct. *St. Louis v. Prarprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986)). "[S]tate law provides a proper source for assessing who possesses final authority to establish municipal policy." *Walker v. City of New York,* 974 F.2d 293, 296 (2d Cir.1992). Actual conduct by a high-level municipal policymaker must be alleged for municipal liability to attach. *Id.* at 296–97. For a subordinate city employee's actions to give rise to § 1983 liability, the action "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. New York City Police Department,* 971 F.2d 864, 871 (2d Cir.1992) (citations omitted).

Plaintiffs have failed to demonstrate that their arrest was caused by any custom or policy of the County. There is no evidence of any pattern of such arrests and no evidence that the Sheriff ever condoned or acquiesced in these arrests.

What has been established is one arrest that was made without probable cause by one member of the Sheriff's Department, Travis. Although unfortunate, this solitary act does not constitute a pattern or custom of such activity. Therefore, defendants' motion for summary judgment as to the County and as to Sheriff Burrell is granted.

### Search Of A Van

Plaintiffs alleged in their complaint that the van was searched without a warrant. However, during discovery it was established that a search warrant had, in fact, been issued. Plaintiffs have, therefore, abandoned this additional Fourth Amendment claim.

Other possible claims relative to issuance of the search warrant have not been pleaded and, therefore, I decline to entertain such claims now.

## Punitive Damages

In addition to compensatory damages, plaintiffs also seek punitive damages. Although liability has been established against Travis, there must still be a trial concerning damages. Matters involving punitive damages relate to the subjective intent of the defendant and are often difficult to resolve on a motion for summary judgment.

A jury may, in its discretion, award punitive damages in a § 1983 case not only for intentional violations of federal law but also for circumstances where the proof establishes a reckless or callous disregard for plaintiffs' rights. *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983).

I cannot say, on this state of the record, that a reasonable juror could not award punitive damages. Plaintiff should be entitled to present proof on this issue and have the jury render a decision on both compensatory and punitive damages.

If the Court believes after trial that the verdict is irrational in light of the proof, it may set aside the verdict. If that decision is reversed on appeal, the jury verdict can simply be reinstated without the necessity of a new trial. *See Vasbinder v. Ambach*, 926 F.2d 1333, 1344 (2d Cir.1991).

## CONCLUSION

From one viewpoint, there is some humor in what occurred here, and the ultimate damage to plaintiffs may prove to be rather slight. However, from another perspective, what happened should not be a matter of amusement.

No unwarranted deprivation of liberty can be condoned or ignored. The right to be secure from unwarranted and unreasonable police seizures is a basic right protected under the Constitution.

The significance of this case is that these two plaintiffs were arrested for engaging in unusual conduct—conduct that was not common or expected. It would be dangerous precedent to suggest that arrests could be made for conduct that was unusual or "different" from the norm. The response and reaction to such unusual behavior may take many forms, but it should not lead to an arrest at gunpoint.

Plaintiffs' motion for summary judgment on liability as to their claim for false arrest under 42 U.S.C. § 1983 in the First Cause of Action is granted as to defendant Travis. In all other respects, plaintiffs' motion for summary judgment is denied.

Defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted in favor of defendants Finch, John and Burrell as to all causes of action and the complaint as to them is dismissed. Defendants' motion for summary judgment as to the County is granted and the complaint is dismissed as to it.

Defendants' motion for summary judgment is granted on plaintiffs' cause of action relating to the issuance and execution of the search warrant.

Defendants' motion for summary judgment concerning punitive damages is denied.

The case is remitted to trial on the issue of damages only.

IT IS SO ORDERED.